IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| GARY D. FROST, | ) | |
| and CHRISTINA B. FROST, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 150150D |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

Plaintiffs appeal Defendant's Conference Decision dated February 10, 2015, for the 2010 tax year. A trial was held in the courtroom of the Oregon Tax Court on February 29, 2016, in Salem, Oregon. Rory B. Tosh, CPA, appeared on behalf of Plaintiffs. Gary D. Frost (Gary), Christina B. Frost (Christina), and Robert Hague (Hague) testified on behalf of Plaintiffs.[2] Peggy Ellis (Ellis) appeared and testified on behalf of Defendant. Plaintiffs' Exhibits 1 through 15 were received without objection.[3] Defendant's Exhibits A through Q were received without objection.

## I. STATEMENT OF FACTS

A.    *Plaintiffs' Evidence*

Gary testified that Plaintiffs purchased a 65 acre parcel in southern Oregon, known as Star Valley Ranch (the Ranch), in 2001. Plaintiffs created a 2002 business plan for the Ranch

---

[1] This Final Decision incorporates without change the court's Decision, entered August 30, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] It is the court's custom to identify parties by their last name; however, in this case because there are two parties with the same last name, they will be identified by their first name.

[3] Exhibit 15 is a video which is not contained in Plaintiffs' Exhibit binder.

which stated the purpose was to first establish a boarding and training facility and then "a breeding operation in which people can bring their mares for artificial insemination for quarter horses and any other breed of horses." (Ptfs' Ex 8 at 1.) The plan projected an income stream of $10,500 per month based on boarding 45 horses and expenses of $8,850.[4] (Ptfs' Ex 8 at 2.) In 2004, the plan was updated to discontinue the on-site trainer and to expand the facility, add a new truck and trailer, add a "hay barn," and acquire "a new show horse." (Ptfs' Ex 8 at 2–3.) Plaintiffs acknowledged at trial that the "hay barn" addition was actually originally intended as a residence for an in-house trainer, and the garage was used to store hay. Gary testified that the Ranch currently has a maximum of 20 horse stalls. In 2009, the Plan was updated to note that "the economic downturn has devastated the horse industry" and that in 2006 they "acquired 2 young yearling fillies for campaigning and in 2007 another mare was purchased and in 2008, we acquired another filly for campaigning under Star Valley Ranch." (Ptfs' Ex 8 at 3.)

Gary testified that he has an undergraduate degree in finance with a minor in economics and has worked for 18 years as a project manager for a software management company and draws a significant salary. He previously worked on a family vineyard but has never worked with animals prior to acquiring the Ranch. Gary testified that he works on the Ranch every evening and on weekends doing a variety of projects including repair, maintenance, meeting vendors and repairpersons, painting, assisting with horse feeding and stall cleaning, mowing, spraying chemicals, fly control, road maintenance, rodent control, fire control, and many other tasks. Gary estimated that he works on average 20 hours per week on the ranch. He testified that he works hard on the Ranch and that it is run with the intent to make a profit. Gary testified that there are no personal horses on the ranch.

---

[4] The plan contained the figure $10,750; however, this was an arithmetic error.

Gary testified that the Ranch has multiple sources of revenue including long term horse boarding, layovers and temporary stays, horse breeding, resale horses, agricultural leases, and dwelling leases. He testified that the horse boarding provides a steady source of income and the foundation for the Ranch to work on its primary objective, which is the breeding operation. He testified that "in the last two years [2014 and 2015] we've turned a profit."

Gary testified that when Plaintiffs purchased the Ranch, there were two horses included: Annie, a seven year old broodmare, and Bennie, a five year old gelding.[5] Annie remained on the Ranch until her death in 2010. (*See* Ptf's Ex 3 at 1; Def's Ex M at 14.) In 2005, Plaintiffs reported on their depreciation schedule several other horses—Dreamer, Fonzi and Janie—but Gary was unable to remember if the horses were at the Ranch at that time. (*See* Def's Ex M at 14–15.)

Christina testified that she had an early foundation in working with and breeding horses and a lifetime of experience in the horse business. She testified that she is the primary manager of the Ranch and works at least 50 hours per week. She testified that she uses QuickBooks to keep track of the Ranch's income and expenses.

Christina testified that she switched breeding strategies from "working cow" horses to "reining" in the mid 2000's. The key to breeding, according to her, is to choose a good cross with a proven winner of which there are only 20 to 25 horses of that caliber in the country. Once bred, the goal is to get the horse winning at shows and generate interest from top breeders and trainers. The Ranch produced six foals since 2001; Christina testified that those horses were sold for prices ranging from $1,500 to $8,500. (*See* Ptfs' Ex 3 at 1–2.) Christina testified that she did not know how much it cost to breed, train, and show any of the horses under her care. John Irish,

---

[5] A gelding is "a castrated male horse." *Webster's Third New Int'l Dictionary*, 943 (unabridged ed 2002)

a trainer and judge with whom Plaintiffs have maintained a business relationship, opined in a January 5, 2015, letter that Plaintiffs have two "better than average mares with the potential to produce yearlings that could sell for an average of $25,000+ each." (Ptfs' Ex 6 at 2.) Christina testified that although Bennie was not kept for breeding, he was an "amazing" horse that they used to promote the Ranch at horse shows. She also testified that she was not sure if Fonzi, a gelding, was maintained at the Ranch or leased out to someone.

Hague testified he is a CPA and a partner with KDP Certified Public Accountants, LLP. He reviewed Plaintiffs' tax returns for the depreciation scheduled for 2010 and going backwards to account for years of loss carryover. Hague testified that Plaintiffs made an error on their returns by listing a rental house on the property as a "hay barn" for the 2004 through 2010 tax years instead of as a rental. As a result he recalculated the building from a 10 year depreciation period to a 27.5 year deprecation period. He testified that he recalculated the original CPA's work regarding the allocation of assets for the original purchase of the house and other assets, the largest of which was the covered arena. Hague testified that he used a construction estimate for the arena, prepared on September 9, 2013, "for insurance purposes," and adjusted the value for costs of living back to 2001. (Ptfs' Ex 4 at 5, 6.) Hague concluded that the cost basis of the arena, adjusted back to 2001, was greater than the amount of depreciation actually taken by Plaintiffs through the 2010 tax year.

B.    *Defendant's Evidence*

Ellis testified that she is a tax auditor for Defendant, and she participated in the audit of Plaintiffs Ranch. Ellis noted that Plaintiffs have incurred large Schedule F farm losses from 2001 through 2014 as follows[6]:

---

[6] This table is from Def's Ex E at 1.

| Year | Income | Expense | Loss |
|---|---|---|---|
| 2001 | $ 2,000 | $112,353 | ($110,353) |
| 2002 | $18,061 | $238,072 | ($220,011) |
| 2003 | $34,683 | $221,529 | ($186,846) |
| 2004 | $36,568 | $232,876 | ($196,308) |
| 2005 | $43,587 | $242,700 | ($199,113) |
| 2006 | $37,711 | $207,599 | ($169,888) |
| 2007 | $33,295 | $204,488 | ($171,193) |
| 2008 | $33,777 | $170,941 | ($137,164) |
| 2009 | $42,660 | $161,346 | ($118,686) |
| 2010 | $47,309 | $145,229 | ($97,920) |
| 2011 | $52,638 | $130,783 | ($78,145) |
| 2012 | $36,226 | $ 88,592 | ($52,366) |
| 2013 | $42,856 | $102,213 | ($59,357) |
| 2014 | $55,315 | $ 54,468 | $ 847 |
| Totals | $516,686 | ($2,313,189) | ($1,796,503) |

Ellis testified that the income and expense history does not show a typical business pattern of decreasing expenses and increasing income; instead the income appears to have reached a plateau based on a maximum boarding capacity. Ellis noted that Plaintiffs have limited stall space for boarding and that their breeding and non-breeding horses limit the number of boarding horses they can accommodate.

Ellis testified that Plaintiffs had significant employment income and other income which enabled them to fund operations on the Ranch. Ellis testified that as a result of the schedule F losses, Plaintiffs reduced their federal and state tax obligations by approximately $500,000 from 2001 through 2014.

Ellis testified that despite the amount of hard work, Plaintiffs lived on their farm property which provided them the type of lifestyle they are seeking. She testified that the type of activity conducted at the Ranch is often associated with personal pleasure.

Ellis testified that Plaintiffs kept a number of horses which were not for breeding, or boarding, and had no relation to their purported business activity; and instead of selling or disposing of them, they maintained those horses and deducted expenses related to their care.

Ellis testified that Plaintiffs did not keep sufficient records to ascertain the actual cost of the boarding or breeding horses so they could make a determination of profitability. Ellis testified that Plaintiffs' "profits" from the Ranch activity in the 2014 tax year were based on a decision by Plaintiffs to move mortgage interest deductions from their Schedule F to their Schedule A and stop claiming other deductions, so as to make it appear the Ranch was profitable.

Ellis testified that Defendant disagreed with Plaintiffs' claimed deprecation of Ranch assets from 2001 through 2010. Ellis testified that Plaintiffs over allocated the value of Ranch assets and undervalued the land and private residence. Plaintiffs' cost basis for Ranch assets of $818,535 was re-allocated to $615,000 based on a 2003 Jackson County Tax Assessment of the property. (*See* Def's Ex A at 14.) Defendant used Plaintiffs' percent allocation in their 2001 return and reduced the depreciation by an estimate of personal business (25%) to profitable business (75%) for those items which they agreed were not personal assets. (*See id.*)

## II. ANALYSIS

The issue in this case is whether Plaintiffs' farm (Ranch) was a business, for which deductions are allowed under Internal Revenue Code (IRC) section 162, or an activity not engaged in for profit under IRC section 183.

A.      *Burden of Proof*

 "The Oregon Legislature intended to make Oregon personal income tax law identical to the [IRC] for purposes of determining Oregon taxable income, subject to adjustments and modifications specified in Oregon law." *Ellison v. Dept. of Rev.*, TC-MD 041142D, WL 2414746 at *6 (Sept 23, 2005) (citing ORS 316.007). The legislature adopted, by reference, the federal definition for deductions allowed under IRC section 162 for trade or business expenses and IRC section 212 for nonbusiness expenses incurred in the production of income. The burden

of proof in the Oregon Tax Court is a preponderance of the evidence and falls upon the party seeking affirmative relief. ORS 305.427.[7] Allowable deductions from taxable income are a "matter of legislative grace" and the burden of proof (substantiation) is placed on the individual claiming the deduction. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992) (citations omitted).

B.      *Deductibility of Farm Expenses*

Under IRC section 162(a), a deduction is allowed for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]" The code and regulations preclude deductions "for expenses incurred in connection with activities which are not engaged in for profit[,]" except as provided in IRC section 183. Treas Reg § 1.183-2(a). "[D]eductions are not allowable under section 162 or 212 for activities which are carried on primarily as a sport, hobby, or for recreation." *Id.* If the activity is not engaged in for profit, expenses may be deducted under IRC section 183 only to the extent of any profits. *Gallo v. Dept. of Rev.*, TC-MD 011022F, WL 21675927 at *3 (July 8, 2003).

> "The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. * * * In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent."

Treas Reg § 1.183-2(a); *see also Comm'r v. Groetzinger*, 480 US 23, 35, 107 S Ct 980, 94 L Ed 2d 25 (1987).

/ / /

---

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

"In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination." Treas Reg § 1.183-2(b). The nonexhaustive list of factors to be considered by the court are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort the taxpayer expends; (4) the expectation that assets may appreciate in value; (5) the taxpayer's success in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. *Id*.

1.      *Manner in which taxpayer carries on activity*

"The fact that the taxpayer carries on the activity in a businesslike manner * * * may indicate that the activity is engaged in for profit." Treas Reg § 1.183-2(b)(1). Under that factor, the court considers "(1) whether the taxpayer maintained complete and accurate books and records for the activity; (2) whether the taxpayer conducted the activity in a manner substantially similar to those of comparable activities that were profitable; and (3) whether the taxpayer changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability." *Giles v. Comm'r*, 89 TCM (CCH) 770 (2005), 2005 WL 375462 at *9 (US Tax Ct) (citing *Engdahl v. Comm'r*, 72 TC 659, 666–67 (1979); Treas Reg § 1.183-2(b)(1)).

"A written business plan is not required if the 'business plan was evidenced by * * * actions.' " *Betts v. Comm'r* (*Betts*), 100 TCM (CCH) 67 (2010), 2010 WL 2990300 at *6 (US Tax Ct) (citing *Phillips v. Comm'r*, 73 TCM (CCH) 2296 (1997), 1997 WL 105015 at *6

/ / /

(US Tax Ct)). In order to indicate a profit motive, the business plan should include "meaningful financial analysis." *Id.*

Plaintiffs created a business plan in 2002 which stated their intent to develop an operation to assist others in breeding and a boarding operation. The plan projected boarding 45 horses with a net profit of $1,650 per month.[8] The plan was updated twice, in 2004 and 2009. Despite Plaintiffs testimony that breeding horses was their main business objective, boarding was their primary source of revenue during the years in issue.

Christina testified that she kept books and records for the Ranch. Those records were conspicuously absent at trial. On cross examination, Plaintiffs were unable to present any meaningful information about the expenses for either the boarding or breeding operations. Plaintiffs opined that they "knew" the ranch would be profitable, but did not present supporting proof for that proposition.

Plaintiffs presented persuasive testimony that their Ranch was operated in a very professional manner with respect to the aesthetics of their property and care for the horses. Yet, from a business perspective, insufficient evidence was presented to show that they operated their Ranch financially similarly to other operations which were profitable.

After years of consistent and very large losses, Plaintiffs made little or no changes to their operations. Plaintiffs 2002 business plan projected housing 45 horses, yet even in their fourteenth year of operations their capacity was only at 20 stalls. Boarding horses was the Ranch's main source of revenue, and despite some expansion on their property, Plaintiffs did not attempt to increase boarding revenue. Plaintiffs "failure to improve profitability and unwillingness to abandon the venture under the circumstances only lead us to conclude as a

---

[8] See footnote 3.

factual matter that they were personally attached to the venture and their 'predominant, primary or principal objective' was not to profit." *Rodriguez v. Comm'r*, 106 TCM (CCH) 333 (2013), 2013 WL 5272771 at *14 (US Tax Ct). Overall, the manner in which the business was conducted weighs against Plaintiffs.

2. *Expertise of taxpayer or their advisors*

"The main inquiry is whether petitioner received advice from the experts as to the accepted principles and economics of profitably running a business * * *." *Betts*, 2010 WL 2990300 at *8 (citations omitted).

Plaintiffs persuasively testified that they often discussed horse operations with experts in the field. They also presented letters from experts in various facets of the business in support of their case. Overall, the court is satisfied that Plaintiffs had the expertise for their horse operation and consistently consulted experts to improve their operation. This factor favors Plaintiffs.

3. *Time and effort expended*

Gary testified that he spent much of his non-employment hours on various aspects of the Ranch. Christina testified that she worked more than full-time on the Ranch. This factor favors Plaintiffs.

4. *Expectation that assets may increase in value*

There are two assets that Plaintiffs may have expected an increase in value: their real property and the broodmares. Holding land with the intent to profit from an increase in its value may be a separate activity than the farm activity.

> "Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value."

Treas Reg § 1.183-1(d).

"Farming and holding land will be considered a single activity only 'if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land.' " *Betts*, 2010 WL 2990300 at \*10, citing Treas Reg § 1.183-1(d)(1). Plaintiffs' deductions taken for the Ranch far exceeded its income from holding of the land.

The expectation as to whether the broodmares would increase in value is a more complex question. Plaintiffs testified that the horses were purchased with the intent that they would have offspring which would generate substantial income. While Plaintiffs' testimony was believable, their subjective statements must be reviewed in light of all of the facts and circumstances. Plaintiffs' optimism in their breeding operations may have been present when they started the operations in 2002, however as the years passed their expectation of appreciation should have become tempered by the reality of year after year losses. Plaintiffs only sold six foals between 2001 and 2014; the largest sale Christina could recall was for $8,500. Yet Plaintiffs deducted more than $1.7 million in expenses. Plaintiffs also maintained, and deducted expenses, for years, animals which had no breeding purpose. Despite Plaintiffs' testimony that they did not have "personal horses" on the Ranch, they acknowledged ownership of several geldings which could not breed and for which no business purpose existed. This factor weighs against Plaintiffs.

5. *Success in carrying on similar or dissimilar activities*

"[A] taxpayer's previous success in similar activities may show that the taxpayer has a profit objective even though the current activity is presently unprofitable. A taxpayer's success in other, unrelated activities also may indicate a profit objective." *Storey v. Comm'r*, 103 TCM (CCH) 1631, 2012 WL 1409273 at \*11 (citations omitted). No evidence was presented that

Plaintiffs have been successful in similar farm activities or that they have "converted them from unprofitable to profitable enterprises." Treas Reg § 1.189-2(b)(5). Gary testified that he owned an interest in a vineyard, but it did not have animals. Christina testified she has lifelong experience with horses, but not as an operator of a horse care and breeding ranch. This factor weighs against Plaintiffs.

6.      *History of income or losses*

> "[W]here losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable * * * may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, * * * such losses would not be an indication that the activity is not engaged in for profit."

Treas Reg § 1.183-2(b)(6).

Plaintiffs contend that a recession, which started in late 2006, affected the profitability of their Ranch. While the recession may have had some impact, the court is not persuaded that the large losses were primarily due to economic situations. Rather, the court finds the losses were endemic to their plan of operations. Plaintiffs contend that they were waiting for a "home run" in the form of very valuable foal. That contention appears unlikely under the evidence presented. Even assuming Plaintiffs' expert, Mr. Irish, was correct in his assertion that Plaintiffs' foals could go for "$25,000+" each, the huge losses would never be erased in light of the low number of foals born on the Ranch.

Plaintiffs contend that the boarding and breeding activities should be viewed together as one business. "Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities." Treas Reg 1.183-1(d)(1); *Keanini v. Comm'r*, 94 TC 41 at 45 (1990). There is a large degree of close organization and economic relationship between the activities; however, Plaintiffs' characterization does not

help their case. While Plaintiffs generated revenue from the boarding operation, they did not present evidence that even that Ranch activity was operated with an intent to make a profit. Plaintiffs testified that the boarding activity was merely to provide a foundation for their other business activities. The court can only, at best, guess that costs were nearly equal to revenue. Looking at the two undertakings together, and the Ranch looks much less like a for-profit business and more like a very intense hobby. Fortunately for Plaintiffs, Defendant took the position of requesting to sustain the audit which had found the activities as separate. This factor weighs against Plaintiffs.

7.      *Amount of occasional profits earned*

"An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small."

Treas Reg § 1.183-2(b)(7).

The significant history of sustained losses was not disputed through the tax year in issue. However, Plaintiffs' contention of a "turn around" in 2014 is not supported by the evidence. Plaintiffs did not show a trend toward profitability by boarding more horses or breeding more foals, but rather reallocated, eliminated, or lessened potential expenses so as to seem more profitable. The court is not persuaded that Plaintiffs had even an occasional substantial profit. This factor weighs against Plaintiffs.

8.      *Financial status of the taxpayers*

"Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not

/ / /

engaged in for profit especially if there are personal or recreational elements involved." Treas Reg § 1.183-2(b)(8).

Plaintiffs received significant income from sources other than the farm and Plaintiffs paid less tax as a result of their farm losses. Plaintiffs had significant sources of income from Gary's employment and his other business interests. But for that income, they would have been unable to sustain the Ranch. For the period 2001 through 2014, Plaintiffs taxable income was reduced by over $1,500,000. (*See* Def's Ex F.) Plaintiffs benefitted substantially from their schedule F losses. This factor weighs against Plaintiffs.

        9.     *Elements of personal pleasure or recreation*

"The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Treas Reg § 1.183-2(b)(9).

Plaintiffs testified that the Ranch activity was hard work while also admitting it had an element of personal pleasure. Christina's testimony showed a strong personal desire to maintain her lifelong activity with horses. Plaintiffs lived and worked on the Ranch which offered them a rural lifestyle that they were seeking. Overall, this factor weighs against Plaintiffs.

C.    *Depreciation*

IRC section 167(a) allows as a depreciation deduction "a reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business[.]" "The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011[.]" IRC § 167(c)(1).

/ / /

/ / /

In addition to challenging Plaintiffs' intent to make a profit, Defendant's audit reduced the amount of depreciation allowed for Ranch Assets back to the time of acquisition in 2001. This was still an issue in 2010 because Plaintiffs had significant loss carryovers from prior years.

Defendant's audit took Plaintiffs' claimed deprecation cost basis of $818,535 and re-allocated it to $615,000 based on a 2003 Jackson County Tax Assessment of the property. Defendant then used Plaintiffs' percent allocation for each asset and reduced the depreciation by an estimate of personal business (25percent) to profitable business (75 percent).

Plaintiffs took issue with the depreciation allocation with respect the "hay barn" and arena. Plaintiffs acknowledged that they improperly depreciated the residential rental house as a "hay barn" with a 10 year depreciation period, when only the garage was used to store hay. Plaintiffs assert that 1,296 of 2376 square feet should be depreciated over 20 years as a hay barn and 1,080 square feet should be depreciated as a rental with a 27.5 year depreciation term.

Since Plaintiffs have the burden of persuasion it is logical to start with their approach. With respect to the rental property which Plaintiff identified and depreciated as a hay barn, the court is not persuaded that merely placing hay in the garage converts a majority of the residential property to depreciable farm property. The evidence presented at trial was insufficient to show the residence was placed into service as a farm asset.

With respect to the covered arena, Plaintiffs attempted to use a 2013 contractor's estimate to rebuild the arena "for insurance purposes" and discount the cost back to 2001 using the Consumer Price Index. Using this method, Plaintiffs arrived at a cost basis as of 2001 of $457,267. (Ptfs' Ex 4 at 5.) Interestingly, Plaintiffs had only depreciated $412,870. (Ptfs' Ex 2 at 12.) Plaintiffs' approach to valuation using the cost approach was not persuasive. While the cost approach is often helpful in valuing improved property, the further back in time you go, the

less accurate the results become. Using a cost approach and going back over a decade, and not accounting for percentage of life of the asset had at the time it was put into service renders the cost analysis presented of little value.

Defendant used a broad brush and many assumptions in recalculating Plaintiffs' depreciation costs. Defendant made assumptions about the correct original allocation for various assets for the original 2001 purchase, using the County's tax assessment, and then discounted depreciation using an estimated 25 percent personal use of assets and 75 percent business use, for assets used in Ranch operations. The approach is reasonable; although the court is not convinced that it is highly accurate. Nevertheless, in a tax appeal, the taxpayer has the burden of coming forward with evidence and must prove by a preponderance of the evidence of the correctness of its propositions. Here, Plaintiffs' have failed to present persuasive evidence in support of their theory on depreciation. Consequently, the depreciation methodology employed by Defendant is sustained.

## III. CONCLUSION

After careful consideration, the court concludes that Plaintiffs did not operate their Ranch with the requisite profit objective during any of the tax years at issue. The court also concludes that Plaintiffs improperly calculated depreciation of Ranch assets from 2001 through 2010. Now, therefore,

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ___ day of September 2016.

RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular
Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR
97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final
Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on September 19, 2016.*